# EXHIBIT 11

CJ-25-6571
Andrews

*1063189722*

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

SEP 11 2025

RICK WARREN
COURT CLERK
88

| | |
|---|---|
| **(1) LINDA AUSTIN,**<br>and<br>**(2) MARTIN AUSTIN,**<br>*Plaintiffs,*<br>v.<br>**(1) STATE FARM FIRE AND CASUALTY COMPANY**, and<br>**(2) REBECCA LAFEVERS INSURANCE AGENCY, INC.,**<br>*Defendants.* | **CASE NO.** CJ - 2025 - 6571 |

**PETITION**

EXHIBIT
11

## I. INTRODUCTION

1. This Petition alleges a systematic and pervasive Scheme on the part of Defendants (a) State Farm Fire and Casualty Company ("State Farm") and (b) State Farm's captive agent Rebecca LaFevers Insurance Agency, Inc. ("Agent").[1] By and through their Scheme, Defendants have caused substantial harm to Plaintiffs.

2. The Petition's **Scheme allegations** here mirror those in other Petitions against State Farm; simply, Defendants have subjected Plaintiffs to the same Scheme impacting numerous other State Farm insureds. Indeed, State Farm has subjected policyholders uniformly (both in Oklahoma and in other storm-prone states) to its Scheme by and through the material assistance of its captive Agents. There are subtle differences across each such Petition—*e.g.*, the date of loss, the agent and adjusters furthering the Scheme, and the specific tactics State Farm used in each instance to deny the claim or force its payment under the policy deductible amount. But the core misconduct at issue remains materially identical in each instance. State Farm routinely assails these similarities as indicia of fraud. But as the Honorable Judge Palk, Western District of Oklahoma, recently held

> the fact that Plaintiffs' claims are premised on the existence of a widespread scheme by State Farm ***dispels*** that the use of a formulaic petition, in and of itself, demonstrates actual fraud.

*Willard v. State Farm*, CIV-25-46-SLP, ECF No. 33, at *15 (W.D. Okla. Aug. 21, 2025) (Palk, D.J.). And as Plaintiffs demonstrate here in **Paragraph 40** below, "each of the

[1] This Petition refers to State Farm and Agent collectively as "Defendants."

petitions include ***unique factual allegations*** demonstrating the specific alleged harm suffered by each plaintiff." *Id.* Thus, State Farm's attacks on the "cookie-cutter" or "form" nature of the numerous complaints based on the Scheme filed against it (arguments State Farm routinely recycles while ignoring the particular **fact allegations** of each petition) are meritless. *See Pruitt v. State Farm Fire & Cas. Co.*, 2025 WL 1030353, at *4 (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.) ("As State Farm is likely aware, several judges in this district have found that allegations of cookie-cutter complaints are, alone, insufficient to establish fraudulent joinder.") (citing *Norman v. State Farm Fire & Cas. Co.*, 2025 WL 342871, at *4 (W.D. Okla. Jan. 30, 2025) (Russell, D.J.). In *Willard*, Judge Palk recognized the common questions of law and fact involved in the eleven State Farm cases before him, ordered that all eleven cases be consolidated, granted remand in all eleven cases, and directed that each case be remanded to the appropriate State of Oklahoma District Court. *See Willard*, CIV-25-46-SLP, ECF No. 33, at *4-7.

3. ***"Like a good neighbor, State Farm is there"***—a ubiquitous and recognizable slogan designed to lure insureds into reliance upon its duty of good faith and promises of comprehensive indemnity. But despite its hollow "good neighbor" promises, State Farm employs a systematic and pervasive Scheme throughout Oklahoma, whereby it wrongfully denies its insureds' claims for damage to their covered property caused by wind and/or hail. At all relevant times, State Farm's Scheme is carried out in substantial and material part by its captive agents (like Agent), who are aware of the Scheme, understand its impact on State Farm insureds (like Plaintiffs), and even benefit from the payment reduction the Scheme is designed to achieve. The Scheme is a product of State Farms'

**Wind/Hail Focus Initiative** (described below) and was engineered by State Farm to accomplish the goals set forth by its Wind/Hail Focus Initiative: the reduction of its indemnity losses on roof replacements. State Farm's denials of wind and hailstorm claims pursuant to the Scheme are unreasonable, lack true justification, and are pre-determined. State Farm and its agents (including Agent) employ the Scheme intentionally, knowingly, and purposefully for profit. They do so in bad faith.

4. Defendants' wind and hailstorm scheme (the "Scheme") operates as follows:

a. State Farm's captive agents (including Agent) market, sell, procure, and bind (whether upon inception and/or at renewal)[2] State Farm **full replacement cost insurance coverage** to the insured at the insured's behest to cover the insured's home. In doing so, State Farm's agent (like Agent here) expressly and/or impliedly represents (i) the property to be insured meets State Farm's **underwriting rules, guidelines, and requirements** for the full replacement cost coverage purportedly bound, and (ii) the replacement cost value (and resultant full replacement cost coverage limit) State Farm's agent calculated for the insured is an accurate reflection of (at least) 100% of the property's insured value—that is, all components of the insured property are fully covered.

b. The agent can only make these representations in good faith if the agent physically inspected the property and verified its condition. This inspection

[2] Under Oklahoma law, each annual issuance of the policy at issue involves each of these acts, whether it be the inception of full replacement cost coverage in the first instance or the subsequent renewal thereof. Therefore, even an agent who renews full replacement cost coverage initially procured by another agent engages in these acts.

practically never occurs, yet State Farm's agents market, sell, procure, and bind State Farm full replacement cost coverage (just as Agent did for Plaintiffs) nonetheless. While this act inherently represents to the insured in each instance that the property in question qualifies for the insurance to be bound and meets the underwriting guidelines governing such full replacement cost coverage, in almost every instance of the Scheme, the agent lacks all practical bases to make such an inherent representation in good faith.

c. Nevertheless, and almost always without verification, the captive agent effectively certifies to State Farm ***and to the insured*** that the property in question meets State Farm's underwriting guidelines, criteria, and rules despite having no reasonable basis to do so and without knowing if the same is actually true.

d. All the while, State Farm's captive agents (like Agent) are aware of the Scheme. They are aware of the practical improbability that State Farm will pay a roof claim by the insured. They are aware that, pursuant to the Scheme, State Farm will drum up a justification for outright denial of the claim or for depressing the payment to an amount under the deductible.

e. State Farm's captive agents (like Agent) are aware State Farm achieves this through an array of bad faith tactics. These include State Farm's use of an undisclosed, narrow, and limited definition of what constitutes covered hail damage. This secret coverage limitation, which is derivative of the Wind/Hail Focus Initiative and inherent to the Scheme, is ***wholly absent from the insured's policy*** and never otherwise disclosed to the insured. That is, the policy does not specifically

define or limit when hail damage is covered under the policy, even though State Farm defines and limits the same internally for the purposes of claims handling. State Farm uses this definition to dictate whether an insured is entitled to payment under the policy upon the filing of a valid wind and/or hailstorm claim, yet it never discloses it to insureds. State Farm agents further the Scheme by refusing to disclose this material, narrow, and limited definition of hail damage when marketing, selling, procuring, and/or binding State Farm full replacement cost coverage—even though the limitation effectively undermines the "full replacement cost" nature of the coverage the insured believed they purchased.

f. Further, State Farm agents (like Agent) are aware of (and fail to disclose) other bad faith claims handling tactics inherent to State Farm's Scheme. These tactics are material to an insured when purchasing an insurance policy; they include State Farm's pre-ordained attribution of covered damage to roofs to some non-covered cause (*e.g.*, wear and tear, granular loss, deterioration, or defect). These non-covered causes, when actually present, either plague the roof from its installation or accrue progressively over time. For example, wear and tear does not accrue instantaneously. That is, when truly present, these defects should almost always be identifiable at the most recent renewal of the policy—a new contract through with the Agent and State Farm again represent the home to fully quality for coverage. So, if actually present, these defects should warrant some reduction in the coverage written on the home and its relative insurance-to-value OR the home remains fully insured despite them.

g. Further, State Farm agents (like Agent) are aware of (and fail to disclose) the ways State Farm adjusters further the Scheme. This includes drafting sham estimates blaming patent wind- and hail-storm damage to non-covered causes to avoid paying for roof replacements. In other instances, State Farm adjusters further the Scheme by manipulating the insured's date of loss to reflect dates on which no hail was detected in the area. State Farm's agents (like Agent) are fully aware of these bad faith tactics (*e.g.*, from repeated customer complaints and cross-agent back chatter), yet they fail to disclose this (and other) material information about State Farm's Scheme in violation of duties owed to the insured.

h. State Farm's agents (like Agent) are motivated to further the Scheme by carrot and stick. On information and belief, the carrot lies in State Farm's agents' compensation, which is based in some part on the ratio of losses deriving from policies the specific agent marketed, procured, sold, bound, and renewed. Thus, any corporate initiative designed to improve that loss ratio—*e.g.*, State Farm's Wind/Hail Focus Initiative and the resultant Scheme to reduce roof spend—only serves to increase the captive agents' compensation. To this end, State Farm provides its captive agents (like Agent) comprehensive training in skillsets that help them advance the Scheme.

i. On the Agent's certification that the property meets State Farm's underwriting guidelines, State Farm issues a policy purporting to convey full replacement cost coverage for the insured's home. State Farm, through both the policy itself and its captive agents, expressly and/or impliedly represents the policy

covers loss arising from a wind or hailstorm. The policy language does not define or otherwise limit wind or hail damage full replacement cost coverage outside the policy monetary full replacement cost coverage limits and the loss triggering clause: "accidental direct physical loss."

j. The insured incurs a covered loss to the insured property arising from wind, hail, and/or tornado and timely files a claim.

k. State Farm denies the claim as part of its Scheme. In each instance, State Farm does whatever it can to avoid replacing the roof. It does so using an array of bad faith tactics rigged against the insured. It denies the claim vis-a vis the roof either outright or, in many cases, by depressing the amount it agrees to pay below the policy deductible, thereby avoiding payment. In limited instances, it may pay for certain property damage that exceeds the deductible. But, in each case, to minimize its payments, State Farm manipulates its damage estimate to ignore patent wind and or hail damage to the insured property, ostensibly blaming it on some non-covered cause of loss.

l. The Scheme is a byproduct of State Farm's Wind/Hail Focus Initiative, which set out to reduce State Farm's indemnity losses on wind and hailstorm claims—most critically, total roof replacements. Non-confidential documents in the public record, such as Exhibit 6 attached to the August 14, 2023 response pleading in CJ-2021-1741, [3] evidence the Scheme in action. A State Farm

[3]Available at https://www.oscn.net/dockets/GetCaseInformation.aspx?db=oklahoma&number=CJ-2021-1741&cmid=3968060 (last visited Sept. 9, 2025).

adjuster testified under oath to how the agent's determination of the condition of the roof at inception or renewal and subsequent denial for "wear and tear" or pre-existing damage are essential in State Farm's denial of full roof replacements. The captive agent is a critical player in the Scheme via its assessment of the property's conformity to State Farm's underwriting guidelines, inspection (or lack thereof) at policy inception and renewal, determination of eligibility for replacement cost, determination of the amount of such replacement cost, and the assessment of the condition of the roof and premises. The State Farm adjuster admitted under oath as follows:

> everyone on our team did not have any authority anymore to total roofs because **we were paying for too many roof claims** ... when I was told that it is not hail or it's not new hail, to call it wear and tear to deny a claim, I felt – I felt bad ... I legitimately felt like there was some damage from hail, from new hail that I felt that the roof should be totaled, that I was told to deny the whole thing, and that – that was difficult.

m. Discovery from State Farm filed in the public record reveals that State Farm captive agents are well aware of how hail claims are being adjusted. In Exhibit 6 to the June 14, 2023 pleading, a State Farm captive agent, David Hoffhines, sent the following email:

> I understand that you are not able to find hail on the date my insured has cell phone pics on? Can we discuss this please?? How do I tell my client that the hail damage marks that were uploaded to the file from contractor are invisible to claims reps and supervisors?? I know the growing trend is for SF to deny hail claims, I'm just curious how do I word this??

n. State Fam's Scheme is under national scrutiny. Recently, the Senate Homeland Security Committee held a hearing on the Insurance Industry's Natural Disaster Practices.[4] For example, Nick Schroeder, a former licensed adjuster for State Farm and Allstate, testified to bad faith claims handling practices nearly identical to Plaintiffs' allegations here:

> More commonly, **these changes were simply excluding hail-damaged shingles due to age or wear**. In one case involving policyholders Susan and Dennis Carter, **I was instructed to deny shingle damage as wear and tear despite visible hail impact marks consistent with adjacent dented metal**. Although I provided a hail report confirming activity near the property on the reported date of loss, **the claim was reassigned after I refused to amend the estimate to exclude hail damage**.[5]

The wealth of evidence here, as well as what Plaintiffs know will be revealed through discovery, establishes a sinister Scheme by State Farm to defraud insureds such as Plaintiffs

o. When subjected to the Scheme, an insured has no choice but to file suit to recover benefits State Farm owes under the policy. State Farm's treatment of Plaintiffs (including bad faith claims handling tactics and material misrepresentations and/or omissions by State Farm and State Farm agents) exemplifies this Scheme in action, as the Petition sets forth in Section III, below.

---

[4] *Available at* https://www.youtube.com/watch?v=Qs2VKoQPvxY (last visited Sept. 9, 2025).

[5] Examining the Insurance Industry's Claims Practices Following Recent Natural Disasters - Committee on Homeland Security & Governmental Affairs, *available at* https://www.hsgac.senate.gov/subcommittees/dmdcc/hearings/examining-the-insurance-industrys-claims-practices-following-recent-natural-disasters/ (last visited Sept. 9, 2025).

p. State Farm has continually asserted a blanket disclaimer of its captive agents' underwriting duties and often states agents are not required to inform insureds about the condition of their home and adjust their coverage accordingly. However, State Farm's own underwriting reviews and similar underwriting documents have revealed that State farm captive agents are in fact tied to underwriting. State Farm captive agents regularly inform insureds about corrective measures required following roof damage to remain eligible for full replacement cost coverage—or else coverage will be reduced or even cancelled. For example, State Farm issued the following underwriting notice to one of its insureds and advised them of underwriting requirements that needed to be fulfilled to reduce the risk of additional damage to the roof. The notice instructs the insured to contact ***their State Farm agent*** regarding such requirements:

Important Notice

On behalf of State Farm, a representative from a survey company visited your home to obtain additional underwriting information. We believe there are positive measures that should be taken to reduce the risk for loss.

The following underwriting requirement(s) must be completed:

Replace all boarded, broken or cracked glass in doors and/or windows to reduce the risk of injury or property damage.

To reduce the risk of property and liability losses, regularly maintain the exterior of the property. Particular attention needs to be given to the removal of:

- miscellaneous personal property.

To reduce the risk of additional damage to the roof and/or interior water damage, the roof on the dwelling must be replaced as evidenced by the deteriorated shingles with granule loss. Have a roofing contractor complete the work.

Eligible roofing material must be used when roof covering is being replaced. Consult with your agent for additional information on eligible roof types.

The outlined requirement(s) present(s) an increase in hazard. Your cooperation with the above underwriting requirement(s) is appreciated. Please provide your agent documentation confirming the underwriting requirement(s) outlined above has been met. This policy will be set to non-renew effective October 21, 2025, unless verification is received.

NOTE: The requirement(s) is made solely to help reduce the potential for future losses insured under your policy. However, it is not a guarantee against future losses. Any costs associated with the requirements outlined in this letter will be at your expense.

If you have any questions regarding the requirement(s) or the timeline for completion, contact State Farm Agent Carla Holzrichter at (918) 367-5547. [6]

Moreover, State Farm issued a similar notice to an insured showing that State Farm captive agents are required to inform insureds of the condition of the home and make the appropriate adjustments to the insurance coverage:

[6] May 23, 2025 Notice to State Farm insureds Josh & Tara Mattox.

IMPORTANT NOTICE
Additional Information

Thank you for your business and continued trust in State Farm®. We look forward to continuing our relationship with you.

Based on your recent roof claim, we have updated your roof age. This update may affect your premium.

If your roof was replaced with a qualifying impact resistant roofing product, you may be eligible for a premium discount.

Please contact your agent to confirm the characteristics of your home and complete a current replacement cost estimate.

It's important to regularly review your State Farm policy to make sure your coverages meet your needs. One important consideration is the comparison of your Coverage A limit to the current estimated replacement cost of your dwelling. If you've remodeled or made any other changes to your dwelling since you purchased your policy that might increase the replacement cost, it's important to update your coverage to reflect these changes. We recommend you select a coverage amount that is at least equal to 100 percent of your estimated replacement cost, but the choice is yours.

State Farm does not guarantee that any type of estimate will represent the actual cost to rebuild your dwelling after a loss. [7]

Thus, State Farm's downplaying of agent underwriting responsibilities is a smokescreen.

## II. PARTIES

5. **Plaintiffs Linda and Martin Austin** ("Plaintiffs") own the Insured Property, which is located in Creek County, Oklahoma. Plaintiffs entered into a contract of insurance with State Farm to provide replacement cost full replacement cost coverage for the Insured Property, dwelling insurance policy no. 36-BK-C075-7 (the "Policy") through Agent's offices. The Policy was in force and effect at the time of the loss in question. The Insured Property was damaged on approximately March 14, 2025. Plaintiffs timely filed a

[7] August 5, 2025 Notice to State Farm insured DKD Properties, LLC ("**Please contact your agent to confirm the characteristics of your home and complete a current replacement cost estimate**.") (emphasis added).

claim for indemnity under the Policy for damage to the Insured Property (the "Claim," No. 36-82Q7-06L).

6. **Defendant State Farm Fire and Casualty Company** ("State Farm") is a foreign insurer licensed to do business in the State of Oklahoma. State Farm may be found and served via its statutory service agent the Oklahoma Insurance Department in Oklahoma County, Oklahoma.

7. **Defendant Rebecca LaFevers Insurance Agency, Inc.** ("Agent") owns and operates a captive State Farm agency in Creek County located at 14 E. Lee Avenue, Sapulpa, OK 74066. Agent was at all relevant times an agent and/or ostensible agent of Defendant State Farm. Upon information and belief, Agent may be served with process via the registered agent, Rebecca LaFevers, at 14 E. Lee Avenue, Sapulpa, OK 74066.

8. Agent is a properly joined defendant to this action, as held in ***thirty-six*** remanded cases against State Farm alleging substantially the same claims and/or Scheme—most recently, *Willard v. State Farm*, CIV-25-46-SLP, ECF No. 33 (W.D. Okla. Aug. 21, 2025) (Palk, D.J.) (order consolidating eleven cases, granting each motion to remand, and directing that each case be remanded to the appropriate State of Oklahoma district court: *Black v. State Farm*, CIV-25-54-SLP (Palk, D.J.); *Harris v. State Farm*, CIV-25-58-SLP (Palk, D.J.); *Riley v. State Farm*, CIV-25-337-SLP (Palk, D.J.); *Giertz v. State Farm*, CIV-25-355-SLP (Palk, D.J.); *West v. State Farm*, CIV-25-388 (Palk, D.J.); *Faust v. State Farm*, CIV-25-442-SLP (Palk, D.J.); *Martin v. State Farm*, CIV-25-519-SLP (Palk, D.J.); *Yost v. State Farm*, CIV-25-526-SLP (Palk, D.J.); *Hursh v. State Farm*, CIV-25-529-SLP (Palk, D.J.); *Davis v. State Farm*, CIV-25-630-SLP (Palk, D.J.)); *see also Maher v. State Farm*

*Fire and Cas. Co. & Terry M. Amacher*, 2025 WL 1909507 (W.D. Okla. July 10, 2025) (Wyrick, D.J.); *Adair v. State Farm Fire & Cas. Co. & Tim Custer Insurance Agency, Inc.*, 2025 WL 1263128, at *1 (W.D. Okla. May 1, 2025) (Dishman, D.J.); *Pruitt v. State Farm Fire & Cas. Co.*, 2025 WL 1030353 (W.D. Okla. April 7, 2025) (DeGiusti, C.D.J.); *Norman v. State Farm*, Remand Order ECF No. 16, CIV-24-1132-R (W.D. Okla. Jan. 30, 2025) (Russell, D.J.); and *Oliver v. State Farm*, Remand Order ECF No. 12, CIV-24-789 (W.D. Okla. February 11, 2025) (Palk, D.J.); *Bartholomew v. State Farm*, 2022 WL 22879674 (W.D. Okla. Dec. 16, 2022) (Jones, D.J.); *Bean v. State Farm*, (N.D. Okla. June 26, 2024) (Cartwright, D.J.); *Burleson v. State Farm*, 2024 WL 3842579 (W.D. Okla. Aug. 16, 2024) (Russell, D.J.); *Champion v. State Farm*, 2023 WL 11944492 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Christy v. State Farm*, 2023 WL 2933312 (W.D. Okla. Apr. 13, 2023) (Russell, D.J.); *Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.); *Harris v. State Farm*, 2024 WL 1957315 (W.D. Okla. May 3, 2024) (DeGiusti, C.D.J); *Jackson v. State Farm*, 647 F.Supp.3d 1195 (W.D. Okla. 2022) (DeGiusti, C.D.J); *Jessop v. State Farm*, 2024 WL 3400543 (E.D. Okla. July 12, 2024) (Melgren, D.J.); *Killingsworth v. State Farm*, (N.D. Okla. April 21, 2023) (Kern, D.J.); *Kyger v. State Farm*, 649 F. Supp. 3d 1200 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *McDow v. State Farm*, 2022 WL 17960457 (W.D. Okla. Dec. 27, 2022) (Friot, D.J.); *Nelson v. State Farm*, 647 F. Supp. 3d 1189 (W.D. Okla. 2022) (DeGiusti, C.D.J.); *Phillips v. State Farm*, 2023 WL 336142 (W.D. Okla. Jan. 20, 2023) (DeGiusti, C.D.J); *Ross v. State Farm*, 2024 WL 1092540 (W.D. Okla. Mar. 13, 2024) (Dishman, D.J.); *Sexton v. State Farm*, 2023 WL 11917022 (W.D. Okla. Jan. 5, 2023) (Jones, D.J.); *Shira v. State*

*Farm*, 2023 WL 4624701 (W.D. Okla. July 19, 2023) (Russell, D.J.); *Stacy v. State Farm Fire & Cas. Co.*, 2023 WL 11915451 (W.D. Okla. Dec. 29, 2023) (Wyrick, D.J.); *Stayton v. State Farm*, (N.D. Okla. April 20, 2023) (Kern, D.J.); *Whitby v. State Farm*, 2023 WL 11763365 (N.D. Okla. Aug. 21, 2023) (Frizzell, D.J.). *See also Martin v. Allstate Vehicle & Property Ins. Co.*, 2024 WL 3510301 (W.D. Okla. July 23, 2024) (Palk, D.J.); *Parkison v. Hanover Ins. Co., et al.*, 2023 WL 8452436 (W.D. Okla. Nov. 20, 2023) (Friot, D.J.); *Wedin v. Allstate*, 2023 WL 6806995 (N.D. Okla. Oct. 16, 2023) (Eagan, D.J.). As Agent is a citizen of the forum-state, removal of this action by any Defendant would be improper.

9. Venue is proper pursuant to 12 O.S. § 137.

## III. FACTUAL BACKGROUND

10. State Farm's Wind/Hail Focus Initiative established State Farm's corporate goal of reducing its indemnity payments by denying full roof replacements to policyholders like the Plaintiffs on valid wind and hail claims. Consequently, State Farm preordained the denial of its insureds' valid claims for wind- and hailstorm damage. This decision reflects simple greed: maximizing profits for State Farm at the expense of its insureds.

11. To achieve this end, State Farm knowingly developed and implemented its enterprise-wide, pervasive, and systematic Scheme. State Farm implements the Scheme throughout Oklahoma using a variety of bad faith tactics and employees at every level of State Farm. State Farm captive agents anchor the Scheme on the front end of the transaction. State Farm reinforces the role of its captive agents (like Agent) through training, compensation, and other incentives. State Farm then utilizes biased third-party adjusters and/or engineers, who further the Scheme by consistently writing reports and

estimates to deny full roof replacements on valid wind and hail claims. State Farm weaponizes these various undisclosed tactics against first-party insureds like Plaintiffs.

12. This case exemplifies the Scheme in action. State Farm's treatment of Plaintiffs and the Claim demonstrates each step in the Scheme leading to State Farm's intended outcome.

**A. State Farm's Captive Agents Anchor the Scheme.**

13. In each instance, State Farm's Scheme begins with its captive agents (including Agent), who market, sell, procure, and bind (whether at inception and/or renewal) State Farm homeowners' insurance full replacement cost coverage to the insured.

**1. State Farm Agent's Duties in Procuring Full Replacement Cost Coverage.**

14. State Farm captive agents market, sell, procure, and bind (at inception and/or renewal) what they tout as ***full replacement cost*** homeowners insurance coverage to prospective insureds. State Farm uses the same insurance policy to issue full replacement cost homeowners coverage in Oklahoma—while the amount of full replacement cost coverage (and premiums charged therefore) differ from insured to insured, the scope of full replacement cost coverage is in large part materially the same for all insureds State Farm subjects to the Scheme.

15. State Farm considers its agents (like Agent) to be the first line of its underwriting division and, thereby, arbitrators of its underwriting guidelines, criteria, and rules vis-à-vis whether a property qualifies for coverage bound. State Farm's captive agents (like Agent) therefore play a crucial role in the Scheme by and through the marketing,

procurement, sale, and binding of State Farm's insurance products to the insured with the warrantee that the property in question fully meets State Farm's underwriting requirements. This role creates key legal duties, which State Farm's Agent owes to the insured:[8]

a. State Farm's agents must use reasonable care, skill, and diligence to procure full replacement cost coverage as the insured requested that meets the insured's stated needs (*see* Note 11, *infra*);

b. State Farm's agents who undertake the calculation of replacement cost for the insured must use reasonable care, skill, and diligence to do so;

c. When State Farm's agents speak, they owe a duty to do so accurately and truthfully; and

d. State Farm agents have a duty to speak and to fully disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external complaints about State Farm's handling of wind and hailstorm claims, and other material information any insured would deem reasonable in making a purchasing decision.

---

[8] Under Oklahoma law, a duty to speak may arise from a partial disclosure. *Thrifty Rent-A-Car Sys., Inc. v. Brown Flight Rental One Corp.*, 24 F.3d 1190, 1195 (10th Cir. 1994) (the law imposes a duty to speak from a partial disclosure because "the speaker is under a duty to say nothing or to tell the whole truth" (citation and internal quotation marks omitted)); *Uptegraft v. Dome Petroleum Corp.*, 764 P.2d 1350,1353-54 (Okla. 1988) ("Although a party may keep absolute silence and violate no rule of equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to disclose the whole truth."); *see also Ervin v. Herb Weaver Ins. Agency, Inc.*, 2022 WL 22839581 (W.D. Okla. Dec. 28, 2022) (Palk, D.J.).

16. Industry standards, as well as agents' legal duty of reasonable skill, care, and diligence in the procurement of insurance, require State Farm's agents to act in accordance with the training and contractual requirements State Farm imposes upon them. These requirements (and State Farm's required training that reinforces those requirements at the agent level) supposedly exist to ensure policyholders receive the full replacement cost coverage they request. They further exist to ensure State Farm's captive agents bind full replacement cost coverage in accordance with their representations to the insured, and to make sure the agent's actions to sell and bind coverage comport with State Farm's internal underwriting guidelines, criteria, and rules.

17. Agent markets as much on Agent's website, assuring insureds that Agent can help obtain coverage to protect homes from "unexpected catastrophe or damage" and that Agent can help with filing a claim for wind and hail damage:

**Welcome Home, With State Farm Insurance**

Being a homeowner comes with plenty of worries. You want to make sure your home and the possessions in it are protected in the event of some unexpected catastrophe or damage. And you also want to be sure you have liability insurance in case someone gets hurt on your property.

**If walls could talk, Sapulpa, they would tell you to get State Farm's homeowners insurance.**

The key to great homeowners insurance.



**Don't Sweat The Small Stuff, We've Got You Covered.**

Fantastic coverage like this is why Sapulpa homeowners choose State Farm insurance. State Farm Agent Rebecca LaFevers can offer coverage options for the level of coverage you have in mind. If troubles like wind and hail damage, drain backups or sewer backups find you, Agent Rebecca LaFevers can be there to help you file your claim.

As your good neighbor, State Farm agent Rebecca LaFevers is happy to help you with creating your homeowners insurance plan. Get in touch today! [9]

Statements such as this one, especially given Oklahoma's extreme weather and frequent hailstorms, further invokes the insured's (Plaintiffs here) reliance on Agent's insurance expertise, superior knowledge, and assurances regarding State Farm homeowners insurance products and coverage.

18. State Farm agents ***should*** meet these duties by verifying the condition of the property to be insured and comparing that to State Farm's underwriting guidelines, criteria, and rules. The most logical way to do so would be an in-person inspection of the Insured Property prior to the inception of full replacement cost coverage and routinely thereafter to verify the condition and attributes of the Insured Property for the purposes of (a) the agent's accurate calculation of replacement cost and (b) the agent's accurate representation that the

[9] https://www.lafeversinsurance.com/insurance/homeowners (last visited Sept. 9, 2025).

Insured Property qualifies for full replacement cost coverage under State Farm's guidelines. Since each renewal is a new sale and contract, State Farm captive agents should maintain a baseline of the property's condition throughout the insurance relationship with the insured. Indeed, not all homes automatically qualify for State Farm's homeowners policies (according to State Farm underwriting rules)—only those which meet those internal underwriting rules constitute a "good risk" for State Farm to insure. It is the State Farm captive agent—and, in this specific instance, Agent—who confirms whether these rules are met with regard to a specifically-insured property (like Plaintiffs' Insured Property).

19. The policy is a contract—one that obligates State Farm to indemnify its insured upon the occurrence of a covered loss. State Farm's issuance of a policy rests on the agent's certification of the property's qualifications under State Farm underwriting guidelines, criteria, and rules—a critical representation to both State Farm and the insured: namely, that the property identified in the policy declarations meets the criteria for the full replacement cost coverage prescribed at the time of inception or renewal for which the agent is responsible.[10] Consequently, ***Agent was responsible for these representations in this case.*** State Farm's captive agent further represents, at the very least impliedly through the act of selling, procuring, and binding full replacement cost coverage (and, in certain instances, expressly) and/or inherently represents that no condition, pre-existing damage,

[10] This must be true, for the issuance of full replacement cost coverage upon a property that does not qualify at the time would constitute an illusory full replacement cost coverage violation, as well as a violation of State Farm's own underwriting rules.

deterioration, wear-and-tear, or other defect will operate to negate the property's eligibility for full replacement cost coverage under the policy in the event of a loss. Agent acted accordingly here.

20. State Farm's agents must use reasonable care, skill, and diligence in making this representation. This would necessarily require an inspection of an insured property to determine this eligibility for full replacement cost coverage under State Farm's internal underwriting requirements. There is no other way for the agent to gather the information it needs to accurately relay to State Farm (and the insured) whether the property rightfully meets State Farm's underwriting criteria for full replacement cost coverage. Thus, there is no other way for State Farm captive agents (like Agent) to meet their duties they owe their insureds (like Plaintiffs).

21. Most captive State Farm agents (including Agent) have binding authority. That means they instruct State Farm to issue full replacement cost coverage to the insured without State Farm's prior approval. By virtue of the act of doing so, the agent certifies and represents to both State Farm and the insured that the property meets State Farm's underwriting rules and criteria and is therefore eligible for full replacement cost coverage. This representation is repeated each time the policy renews, such that the agent represents the property's eligibility (and, thereby, the absence of any condition that would negate that eligibility), each policy year upon renewal. This representation was repeated accordingly in this instance by Agent to Plaintiffs (and, thereby, State Farm).

22. If State Farm's captive agent were to find the property fails to quality for full replacement cost coverage (as defined by State Farm's underwriting rules) at any point in

the insurance relationship (*e.g.*, the roof is too old, too worn, in poor condition, or otherwise affected by pre-existing damage), the State Farm agent owes an independent duty to report the same to both the insured and to State Farm. This should result in reduction, denial, or cancellation of the insured's full replacement cost coverage and impact the nature of "100% insurance to value" vis-à-vis the insured property. Of course, this determination would likely first require the State Farm agent's physical inspection of the roof, which practically never occurs. On information and belief, no such inspection of Plaintiffs' home occurred here.

23. Ultimately, and as here, State Farm's agent markets, sells, procures, and binds full replacement cost coverage for the property on behalf of State Farm. State Farm then issues a resultant homeowners insurance policy upon the agent's certification that all binding and underwriting guidelines, rules, and criteria are met. Remarkably, State Farm's agents almost never take the steps necessary to verify with reasonable care, skill, and diligence the accuracy of this representation. This means they represent the property's eligibility under State Farm's underwriting rules to both State Farm and the insured recklessly and blindly, without ever verifying whether that representation is true, in almost every instance of the Scheme. ***On information and belief, Agent took no reasonable care, skill, or diligence to verify the accuracy of Agent's representation that the property fully qualified for State Farm full replacement cost coverage at 100% insurance to value.***

24. This consistent, blind misrepresentation is a necessary furtherance of the Scheme in each instance (including Plaintiffs' case); State Farm's agents cannot bind a policy without first representing the property qualifies for full replacement cost coverage.

State Farm provides training to its captive agents in accordance with the Scheme, and each State Farm captive agent relies on this uniform training to make the same or similar representations that each Insured Property is eligible for the full replacement cost coverage sought under the same State Farm underwriting rules. This uniformity allows State Farm to effectuate its Scheme with consistency and makes Plaintiffs' case an exemplary instance of the Scheme.

**2. Agent's Treatment Exemplifies the Scheme.**

25. Agent's treatment of Plaintiffs exemplifies the Scheme and shows it in action:

a. Plaintiffs contacted Agent to procure homeowners insurance from State Farm. Plaintiffs specifically requested Agent obtain a replacement cost policy that would provide ***full replacement cost coverage***[11] for the Insured Property in the event of a loss.

b. To that end, Plaintiffs expressly and/or inherently disclosed concerns and insurance needs to Agent. Above all, given Oklahoma's extreme weather, Agent is aware that the Plaintiffs required full replacement cost coverage under a policy that would fully replace the Insured Property's roof in the event of a tornado, windstorm, and/or hailstorm loss, without exclusion of any weather-related losses.

[11] *See Rains v. CSAA Fire & Cas. Ins. Co.*, 2020 WL 6729085, at *6 (N.D. Okla. Nov. 16, 2020) ("Unlike requests for "full" or "adequate" coverage, a specific request for "replacement" coverage, could qualify as a "need[ ] ... disclosed by the insureds" that would trigger an agent's duty to provide such coverage if promised. *Rotan*, 83 P.3d at 895. The term "replacement coverage" is a term that connotes a specific type of coverage.").

c. By virtue of the act of marketing, selling, procuring, and binding full replacement cost coverage under the Policy (whether at inception or renewal, and without any limitation for wind- or hailstorm damage), Agent independently established, calculated, and set the Policy's replacement cost value and resultant policy full replacement cost coverage limits. Neither Agent nor State Farm required or otherwise asked Plaintiffs to calculate or request a specific amount of full replacement cost coverage for the Insured Property. Instead, Agent took on that responsibility and thereby incurred the duty to do so accurately and with the requisite skill, knowledge, and expertise. Given Agent's touted expertise, the only way it could have possibly done so, in a manner commensurate with its duties, is by means of an inspection of the home to ascertain its condition and qualities.

d. By virtue of the act of marketing, selling, procuring, and binding full replacement cost coverage under the Policy and binding full replacement cost coverage (without limitation), Agent independently selected and calculated full replacement cost coverage and expressly and/or inherently conveyed that such full replacement cost coverage limit was accurate, correct, commensurate with actual reconstruction costs, and represented 100% of the Insured Property's insurance to value. Agent thereby inherently represented to Plaintiffs that the property met State Farm's underwriting guidelines and qualified for the full replacement cost coverage Agent bound.

e. Both Agent and State Farm thereby either knew or should have known of any material defect, pre-existing damage, or other condition(s) that would

exclude the Insured Property from full replacement cost coverage in violation of State Farm's underwriting guidelines, rules, and criteria.

f. Both Agent and State Farm knew State Farm purposefully uses hidden definitions of wind- and/or hailstorm damage to deny claims, along with other bad faith tactics described herein, but failed to disclose these to insureds in the Policy or at any point prior to claims adjustment.

26. In furtherance of the Scheme, Agent committed the following strategic and material ***omissions***:

a. On information and belief, neither Agent nor State Farm took reasonable care, skill, or diligence to verify the condition of the Insured Property (*e.g.*, by means of an inspection or otherwise).

b. On information and belief, neither Agent nor State Farm ever verified the Insured Property's condition, characteristics, attributes, etc.—whether at Policy inception or upon each subsequent annual renewal of the Policy.

c. Regardless of whether an inspection occurred, neither Agent nor State Farm ever disclosed to Plaintiffs that the Insured Property was ineligible under State Farm's underwriting guidelines for the requested full replacement cost coverage for any reason.

d. Regardless of whether an inspection occurred, neither Agent nor State Farm took reasonable care, skill, and diligence in maintaining a current understanding of the Insured Property's condition throughout the course of renewal.

e. Neither Agent nor State Farm ever advised Plaintiffs that the Insured Property had any defect, pre-existing damage, or other conditions that would exclude it under State Farm's underwriting rules from full replacement cost coverage.[12]

f. Neither Agent nor State Farm ever advised Plaintiffs of State Farm's Scheme, including but not limited to State Farm's internal and clandestine definitions of "hail damage," "wear and tear," "granular loss," "functional damage," etc.

g. Neither Agent nor State Farm required or otherwise asked Plaintiffs to calculate or request a specific amount of full replacement cost coverage for the Insured Property—rather, Agent assumed this duty and thereby assumed the duty to do so accurately, with requisite skill, knowledge, and expertise, and in a way commensurate with his duties. These obligations necessitated a physical inspection of the Insured Property, which would have disclosed any defect, pre-existing damage, or full replacement cost coverage-negating condition.

h. Neither Agent nor State Farm disclosed to Plaintiffs that the value Agent calculated for the Insured Property and resultant full replacement cost coverage limits did not in fact represent 100% insurance to value because State Farm had already pre-ordained the denial of any claim for roof damage.

[12] As explained above, had Agent identified any such condition, Agent would have been required to report the same to both Plaintiffs and State Farm and adjust full replacement cost coverage accordingly.

i. Neither Agent nor State Farm disclosed to Plaintiffs the existence of the Scheme, the Wind/Hail Focus Initiative, or any aspects thereof.

27. Nevertheless, and under the cover of Agent's strategic and material omissions, Agent marketed, sold, procured, and bound full replacement cost coverage without limitation. State Farm issued the Policy. Agent, by virtue of these acts, represented that Plaintiffs were covered under the Policy for all fortuitous losses, including all weather-related damage.

28. Given Agent's purported expertise and specialized knowledge of insurance policies, Plaintiffs reasonably relied on Agent for the same.

**B. State Farm Uses a Standardized Policy to Perpetuate the Scheme.**

29. State Farm uses the same replacement cost policy to issue homeowners insurance full replacement cost coverage throughout Oklahoma.[13] State Farm's policy is integral to the Scheme: the criteria, limitations, exclusions, and other tactics State Farm employs in adjusting windstorm, hailstorm, and tornado claims, which are at issue in this case, are wholly absent from the four corners of State Farm's policy. This is true for each Scheme victim—in no instance does State Farm disclose these hidden tactics in a policy to

[13] This Petition does not allege that the *terms* of State Farm's policy or the rates State Farm charges therefore are unlawful. Plaintiffs do not invoke (and further disclaim) any invocation of the filed-rate doctrine. Rather, the Petition alleges conduct on State Farm's part (as well as that of Agent) that does not square with the four corners of State Farm's policy—that Defendants use hidden and undisclosed claims handling criteria, limitations, exclusions, and other tactics that are wholly absent from the terms of the policy. This renders Defendants' ***conduct*** unlawful. Therefore, any argument that this Petition invokes the primary jurisdiction of the Oklahoma Department of Insurance, or the Commissioner, is a misled end-run around bad faith jurisprudence and tort law in Oklahoma.

an insured.

30. State Farm and its captive agents (like Agent) represent the policy to be a replacement cost policy. The full replacement cost coverage limit for the property insured under the policy is keyed to its replacement cost value, such that the policy should afford an amount of full replacement cost coverage that represents (at least) the full amount needed to replace the Insured Property in the event of a loss. State Farm, through its captive agents (like Agent), voluntarily assumes the responsibility of calculating both the replacement cost value and the resultant full replacement cost coverage limit for the insured.

31. State Farm's replacement cost policy functions like an "all risk" policy: that is, if the policy does not expressly exclude a loss, then the policy should afford full replacement cost coverage for the loss pursuant to the loss clause. Thus, State Farm's policy affords full replacement cost coverage for the property in question for damage resulting from hail because hail damage is not expressly excluded from full replacement cost coverage. The policy speaks only to "accidental direct physical loss" therefrom, with no other limitation or definition disclosed.

> **COVERAGE A – DWELLING**
>
> ***We*** **will pay for accidental direct physical loss to the property described in Coverage A, unless the loss is excluded or limited in SECTION I – LOSSES NOT INSURED or otherwise excluded or limited in this policy. However, loss does not include and *we* will not pay for any *diminution in value*.**

32. The policy does not define, limit, or otherwise mitigate full replacement cost coverage for tornado, wind- and/or hail-storm damage outside of "accidental direct

physical loss" therefrom. The policy does not provide any limitations on how or when such full replacement cost coverage will apply to a roof. It does not specify, condition, define, or limit that full replacement cost coverage in any way, *e.g.*, minimum windspeeds, the type of roof damage, a minimum number of hail strikes per square foot, a minimum size of hail, etc. Rather, all of these ***very real*** limitations exist in State Farm claims handling procedures, which lie obscured beyond the view and understanding of the insured until the insured files a claim and confronts the Scheme.

33. On its face, State Farm's policy merely purports to provide the insured the broadest form of full replacement cost coverage available today. State Farm's policy cover page (and, therefore, Plaintiffs' Policy's cover page) states as follows:

StateFarm

This policy is one of the broadest forms available today, and provides you with outstanding value for your insurance dollars. However, we want to point out that every policy contains limitations and exclusions. Please read your policy carefully, especially "Losses Not Insured" and all exclusions.

State Farm®
**Homeowners Policy**

**C. State Farm Employs an Array of Bad Fath Claims Handling Tactics to Perpetuate the Scheme.**

34. State Farm's Scheme then turns on a series of bad-faith claims handling tactics, which help State Farm justify its denial of valid claims. These tactics, along with State Farm's agent's complicity (described above), are all part of State Farm's Wind/Hail Focus Initiative—an enterprise-wide program State Farm implemented through its

property and casualty claims department to reduce its indemnity losses related to roof damage from wind, hail, and tornado. The Wind/Hail Focus Initiative included an array of claims handling practices that are wholly absent from the policy and any disclosures made to the insured (until, of course, State Farm ambushes the insured with a denial). These practices include, but are not limited to, the following:

35. **State Farm employs a narrow and limited definition (as well as restrictive claims handling protocols) for hail damage.** This allows State Farm adjusters to deny claims even when their loss inspection clearly shows hail damage to the insured roof. State Farm's narrow and limited definition is absent from the four corners of the policy and hidden from the insured until State Farm uses it to deny a valid claim. State Farm's captive agents (including Agent here) are fully aware of the narrow and limited definition, this critical disclosure is concealed, and State Farm's insureds are wholly unaware of full replacement cost coverage limitation until they suffer a loss, file a claim, and receive a denial. It is only when the insured becomes the latest victim of State Farm's Scheme that the insured learns of State Farm's internal limitations to its full replacement cost coverage regarding hail damage. This is precisely what happened to Plaintiffs.

36. **State Farm's adjusters misattribute damage to non-covered causes of loss.** State Farm's adjusters find damage to the insured property but attribute that damage to a non-covered cause of loss—most commonly, "wear and tear," "pre-existing damage," or "manufacturer defect." With regard to roof shingles, State Farm often misclassifies shingle damage as "granular loss." This finding flies in the face of Defendants' representations and/or material omissions, which are inherent to the act of procuring,

binding, and renewing full replacement cost coverage. In many instances, this is stated plainly on State Farm's denial letter. In other instances, the adjuster simply fails to acknowledge the damage at all. Yet there is, indeed, patent wind- and/or hailstorm damage, such that the insured was compelled to file the claim. The adjuster simply fails to record it as a covered cause of loss—thereby implying that the damage was caused by some other, non-covered cause. Critically, Defendants expressly and/or impliedly represent that the Insured Property qualifies for the full replacement cost coverage bound by virtue of the act of binding the full replacement cost coverage. Thus, if the roof suffered from a manufacturer defect, pre-existing damage, or substantial wear and tear, the roof may not qualify for full replacement cost coverage (whether at inception or annual renewal). This should be detected by the Agent's inspection and inform some change in full replacement cost coverage. These defects cannot accrue or appear by fiat in the mere months between the most recent policy renewal and the date of loss. It is, at best, duplicitous for Defendants to, on one hand, tell the insured that the property fully qualifies under State Farm's underwriting rules for the full replacement cost coverage bound and then, with the other, tell the insured that it in fact did not. This is exemplary ambush claims-handling and *prima facie* bad faith.

37. **State Farm adjusters misstate the date of loss.** If the insured is unable to pinpoint the exact date of loss, State Farm's adjuster uses the opportunity to further the Scheme and justify State Farm's pre-ordained denial of the claim. In these instances, State Farm adjusters review the Accuweather data and *choose* a date of loss that either (a) falls outside its hidden one-year limitation or (b) shows insufficient hail occurred to constitute

a covered claim under its clandestine rules. If the insured pinpoints a date certain for the date of loss, State Farm may still use Accuweather to justify its wrongful denial of the insured's hail damage claim.

38. In addition, State Farm subjects its insureds to arbitrary limits on the time to file claims, manipulates damage findings to ensure losses fall under the policy deductible, and even employs its hand-chosen engineering firms (who are dependent on State Farm for business) to drum up sham reports that rubber-stamp its adjusters' misrepresentations.

39. Each of these aforementioned bad-faith claims handling tactics perpetuates the Scheme and allows State Farm to deny valid property insurance claims. State Farm trains its claims handling personnel to implement these tactics. State Farm trains its captive agents (like Agent) to market, sell, and bind full replacement cost coverage in a way that allows the Scheme to carry forward undetected.

**D. Defendants Subjected Plaintiffs to the Scheme.**

40. The manner in which State Farm handled the Claim illustrates State Farm's Scheme and clearly demonstrates State Farm's bad faith:

a. On March 14, 2025, the Insured Property was ravaged by a historic windstorm that made news headlines throughout Oklahoma and national outlets. The NASA Earth Observatory labeled this storm a "dusty inferno" and described it as follows:

> In Oklahoma, **hurricane-force winds gusted up to 85 miles (137 kilometers) per hour**, triggering a massive dust storm and fanning fast-moving grass fires that caused the state's governor to declare a state of emergency in 12 counties. **The high winds and fires damaged more than 400 homes and**

> **structures**, including at least 70 homes in Stillwater that were destroyed. The extreme weather also caused tens of thousands of power outages and triggered deadly traffic accidents.
>
> More than 170,000 acres of land burned, according to *The Oklahoman*. Many fires raged in parched grasslands that had been abnormally dry and drought-prone in recent weeks, according to the U.S. Drought Monitor.

*Available at*: https://earthobservatory.nasa.gov/images/154054/dusty-inferno-hits-oklahoma (last visited Aug. 23, 2025) (emphasis added).

b. The Insured Property was devasted. Roof shingles were ripped from the roof and littered the front and back yard. Most of the roof shingles left were lifted from the roof and/or standing up. Further, debris from the "hurricane-force" winds scattered the home and yard.

c. On March 17, 2025, Plaintiffs properly and timely submitted a claim to State Farm through Agent. Agent informed Plaintiffs to have a roofer inspect the roof damage, obtain an estimate, and then call in with a claim. As such, Plaintiffs followed Agent's advice and hired a reputable and noteworthy roofing contractor to assess the damage to the roof.

d. On March 18, 2025, Plaintiffs' roofing contractor inspected the roof directly and observed the widespread damage, including the loose shingles that were lifted from the roof and extensive amount of missing shingles. The roofing contractor returned to the Insured Property and assisted Plaintiffs by mitigating the roof damage. Plaintiffs' roofing contractor subsequently prepared a roofing estimate for the Insured Property dwelling roof, as well as the two shed roofs. In accordance

with these estimates, Plaintiffs' roofing contractor informed them that all three roofs had been totaled by the historic windstorm and all roofs required full replacement.

e. On or about April 17 or April 22, 2025, State Farm dispatched its adjuster, Cody Redrick, to inspect the damage to the Insured Property. Plaintiffs informed Mr. Redrick that Mr. Austin and Plaintiffs' roofing contractor needed to be present for the inspection, which Plaintiffs confirmed with Mr. Redrick would take place at 2:30 pm. However, Mr. Redrick intentionally ignored Plaintiffs' request and arrived early for the inspection—when Mr. Austin and Plaintiffs' roofing contractor were unavailable and could not attend the inspection to point out their damage findings.

f. Mrs. Austin was home and respectfully requested Mr. Redrick to wait to inspect the roof when Mr. Austin and the roofing contractor could be present. Mr. Redrick ignored the request and proceeded with his inspection of the dwelling roof. Further, he told Mrs. Austin that ***State Farm was not going to pay for a new roof whether he met with Mr. Austin or not***. It was clear Mr. Redrick was acting in furtherance of the Scheme and its pre-determined denial.

g. In accordance with State Farm's Wind/Hail Focus Initiative and resultant Scheme, Mr. Redrick's inspection was woefully inadequate. He spent no more than fifteen minutes inspecting the dwelling roof. He wholly failed to inspect the two shed roofs. He informed Mrs. Austin that State Farm would not pay for a full roof replacement on the dwelling.

h. Mrs. Austin implored Mr. Redrick to inspect the shed roofs (as they were covered under the Policy). Mr. Redrick finally, yet reluctantly obliged. He spent no more than fifteen minutes inspecting one shed roof and then walking around the second shed while merely inspecting the roof from the ground.

i. Despite Mr. Redrick's unwillingness, Mrs. Austin was able to convince Mr. Redrick to stay until Mr. Austin arrived to talk with him about the roof damage. During their conversation, Mr. Redrick picked up a sheet of shingles from the yard that had been torn off by the windstorm and informed Plaintiffs: "see this, your roof is still good." Mr. Redrick blindly refused to acknowledge the blatant wind damage to the entirety of the roof shingles and mishandled the Claim. Mr. Redrick's conduct indicates State Farm's pretextual and preordained denial of Plaintiffs' claim.

j. The Wind/Hail Focus Initiative and resultant Scheme dictated that Mr. Redrick purposefully ignore patent wind/hail damage to the roofs' shingles and various other portions of the roofs and also attribute such damage to pre-existing, non-covered causes of loss like, *e.g.*, wear-and-tear, weathering, deterioration, granule loss, and other pre-existing damage. *See* ¶¶ 34-36, *supra.*

k. In furtherance of the Scheme, Mr. Redrick prepared a shoddy, manipulated estimate of the damage to avoid payment of Plaintiffs' full replacement cost benefits for the totaled roofs. Key elements of State Farm's Scheme can be found in Mr. Redrick's manufactured estimate. This includes (but is not limited to) (a) damage intentionally limited to the dwelling roof's soft metals (*i.e.*, pipe jack

flashing, roof vents, rain cap, etc.); (b) replacement of only the back-slope portion of the dwelling roof, which resulted in an outright denial for the dwelling roof despite devastating damage that tore entire sections of shingles from the roof and lifted them up from the historic winds; and (c) the cost of "roof replacements" purportedly provided by State Farm for the shed roofs were purposefully low-balled to avoid paying the actual cost of full replacement cost benefits owed to Plaintiffs.

l. State Farm (through Redrick) intentionally ignored the full extent of devastating wind damage, including shingles completely ripped away from the entirety of the roof, not just the back-slope portion. Redrick's manipulated damage findings and estimate resulted in an egregiously low-balled Claim payment of $1,254.82 for the totaled roofs. State Farm's check described this payment to be for "shed roof replacement and rear slope replacement on house roof."

m. On May 1, 2025, State Farm issued Plaintiffs a letter informing them of the low-ball Claim payment of $1,254.82. Although this effective denial letter was silent as to pre-existing damage/conditions (*i.e.*, wear & tear, deterioration, granular loss, age, etc.), State Farm clearly relied on the same in denying the claim. State Farm's internal rules and training guidelines/requirements dictate a bad faith pattern and practice of relying on/misattributing damage to pre-existing damage because it is a non-covered cause of loss that enables State Farm to avoid paying the claim. *See* ¶¶ 4, 36, 40(i)-(j), *supra*. State Farm intentionally disguised its reliance on pre-existing damage for Plaintiffs' Claim, as State Farm almost always does. Thus, State Farm relied upon pre-existing damage for the intentionally low-balled

evaluation of the damage and denied the Claim in a way that negated the full replacement cost coverage for the Insured Property.

n. However, State Farm did appear to suggest that the age of the roof and condition of the property (both pre-existing issues) may be a problem due to its explanation in the denial letter that the actual cash value (ACV) payment was based on the "replacement cost less allowance for **reasonable depreciation based on the age and general condition of your property**."

o. After State Farm's offensive Claim payment, Plaintiffs reached out to State Farm multiple times for an explanation as to why they were being denied the full replacement cost benefits they believed they had purchased from Agent. State Farm was unresponsive and refused to talk with Plaintiffs. Agent subsequently stepped in to invoke a response from State Farm.

p. Finally, on May 20, 2025, Mr. Redrick informed Plaintiffs that only the back slope of the dwelling roof had wind damage. This statement was patently false considering the wealth of evidence provided to State Farm showing the devastating wind damage to the entire roof that warranted full replacement.

q. Plaintiffs' roofing contractor provided an estimate for full roof replacements for the dwelling and two sheds that contradicts State Farm's low-ball estimate and Claim payment that furthered the Scheme. The photographs taken by Plaintiffs' roofing contractor demonstrate an entirely different narrative and directly contradict State Farm and Mr. Redrick's findings:













These few photographs demonstrate the malicious nature of the Wind/Hail Focus Initiative and resultant Scheme; they show how State Farm mandates the blind ignorance of its adjusters like Redrick.

r. To date, State Farm has wrongfully withheld Plaintiffs' full replacement cost benefits they are entitled to under the Policy. State Farm and Mr. Redrick never intended to handle the Claim fairly and knew the Claim would be denied in furtherance of the Wind/Hail Focus Initiative.

s. Agent advanced State Farm's Wind/Hail Focus Initiative and resultant Scheme by refusing to disclose to Plaintiffs at any time Agent's knowledge of State Farm's secretive bad faith tactics and "hail damage" definition that is absent from the Policy. Further, Agent's underwriting failures in failing to inspect the Insured Property at any time and/or failing to verify the condition of the Insured Property allowed State Farm to ambush Plaintiffs with a denial based in part on pre-existing

damage (whether inherently or expressly) and other non-covered causes of loss (wear and tear, deterioration, granule loss, age, condition, weathering, etc.). *See* ¶¶ 4, 10, 13-28, 34-36, *supra*. Agent never disclosed to Plaintiffs at inception of the Policy and at each subsequent renewal that their roof had pre-existing damage or other defects that would negate their full replacement cost coverage upon the submission of a valid claim. *See id.*

t. State Farm has established a pattern and practice of forcing insureds to file lawsuit to obtain their full replacement cost benefits, including but not limited to the payment for a full roof replacement. This is due to State Farm's cost-benefit analysis that led to its decision to create the Wind/Hail Focus Initiative and resultant Scheme. The Scheme is premised on the notion that most insureds will just accept State Farm's bad faith investigation and evaluation of the claim and will not pursue a lawsuit because they are unaware of the Scheme. Upon information and belief, State Farm will follow this pattern and practice and issue Plaintiffs here a post-litigation claim payment for an amount somewhere near the cost of a full roof replacement. However, this is bad faith and any such claim payment should have been issued early on in the claim when it was evident that full roof replacement was required pursuant to the Policy. Instead, Plaintiffs were subjected to the Scheme, which they had no knowledge of and did not anticipate.

u. Therefore, State Farm has withheld pertinent benefits, full replacement cost coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices

Act, 36 O.S. §§1250.1-1250.16 and has wrongfully forced Plaintiffs to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy. *See* 36 O.S. §1250.5(13) ("***Compelling, without just cause, policyholders to institute suits to recover amounts due under its insurance policies*** or insurance contracts ***by offering substantially less than the amounts ultimately recovered in suits brought by them***, when the policyholders have made claims for amounts reasonably similar to the amounts ultimately recovered.") (emphasis added).

## IV. FRAUDULENT CONCEALMENT

41. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

42. At all relevant times, Defendants concealed material facts about State Farm's Scheme from Plaintiffs. This concealment protected and perpetuated the Scheme, such that Plaintiffs had no way of ascertaining the Scheme or the accrual of any cause of action against Defendants.

43. The Scheme is an artifice, which State Farm designed to be hidden from its insureds' discovery. To wit, the inherent nature of State Farm's "good neighbor" promises—the duty of good faith and fair dealing State Farm owes its insureds—makes the artifice appear reliable. Insureds of ordinary prudence have no means of discovering the Scheme or their right to pursue recovery under the law.

44. Defendants' fraudulent concealment tolls the running of any applicable statute of limitations.

## V. COUNTS

### COUNT I: BREACH OF CONTRACT
***Against Defendant State Farm***

45. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

46. Plaintiffs entered into a contract of insurance (the "Policy") with State Farm to provide homeowner's insurance for the Insured Property. The Policy was in full force and effect at all material times hereto.

47. Plaintiffs provided proper and timely notice to State Farm of the Claim for damage arising from wind and/or hail, which caused significant damage to the Insured Property.

48. The Policy full replacement cost coverage includes all fortuitous losses—which necessarily includes damage sustained by wind and/or hail. The Policy language does not define, distinguish, or limit wind and/or hail damage in any fashion.

49. Plaintiffs complied in all material ways with the terms and conditions of the Policy.

50. State Farm breached its contractual obligations under the terms and conditions of Policy by failing to pay Plaintiffs all benefits owed under the terms and conditions of the Policy and for wrongfully underpaying and denying portions of the Claim.

51. Consistent with State Farm's pervasive, state-wide fraudulent Scheme described in detail throughout this Petition, State Farm actively, intentionally, and fraudulently concealed its Scheme to deny and/or underpay valid hail damage claims from

Plaintiffs. This concealment is an inherent and important aspect of State Farm's Scheme; as State Farm knew its Scheme would work only if it was kept secret.

52. As a result of State Farm's breach of contract and other wrongful conduct, Plaintiffs incurred damages.

**COUNT II: BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**("Bad Faith")**
***Against Defendant State Farm***

53. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

54. At all relevant times hereto, State Farm owed Plaintiffs a duty of good faith and fair dealing.

55. State Farm knowingly, intentionally, purposefully, wrongfully, and repeatedly breached its duty to deal fairly and in good faith by engaging in at least the following acts and omissions:

a. knowingly engaging in a pattern and practice of

i. denial-oriented investigations and claims-handling practices;

ii. arbitrary and capricious claims handling;

iii. denying and or underpaying indemnity payments owed to its first-party insureds on valid hail claims, including Plaintiffs;

iv. withholding pertinent benefits, full replacement cost coverages, and other provisions due to Plaintiffs under the terms and conditions of the Policy in violation of the Unfair Claims Settlement Practices Act, 36 O.S. §§1250.1-1250.16;

v. limiting and/or denying rights inherent to Plaintiffs;

vi. recklessly disregarding said rights;

vii. forcing Plaintiffs to retain counsel to recover insurance benefits owed under the terms and conditions of the Policy;

viii. manipulating claims to ensure damages fall below the policy deductible;

ix. ignoring covered hail and windstorm damage;

x. engaging in the pattern and practice of denying full roof replacement claims by asserting pre-existing damages and faulty installation without a pre-inception property inspection and/or without reasonably updated knowledge of the pre-loss condition of the subject property;

xi. implementing the Wind/Hail Focus Initiative with the goal of reducing indemnity payments and deny full roof replacements to policyholders like the Plaintiffs on valid wind and hail claims;

xii. utilizing biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims;

b. knowingly and purposely failing to

i. inspect the Insured Property prior to inception of the full replacement cost coverage and/or maintain current information as to the condition of the Insured Property prior to the loss;

ii. notify Plaintiffs, both prior to and at the inception and renewal of the Policy, of any pre-existing damage and other conditions that, if a claim were made, would limit full replacement cost coverage;

iii. communicate all full replacement cost coverages and benefits applicable to the Claim;

iv. perform a proper, timely, fair, and objective investigation of the Claim;

v. pay the full and fair amount for the hail damage sustained to the Insured Property in accordance with the Policy's terms and conditions;

vi. base its denial of the Claim on a valid, accurate, and reasonable grounds;

vii. disclose the Scheme to Plaintiffs; and

viii. disclose State Farm's lack of compliance with its own underwriting guidelines, policies, and procedures in denying full replacement cost coverage to Plaintiffs.

56. State Farm's conduct, as described above, constitutes bad faith and is a material breach of the terms and conditions of the Policy and its underlying insurance

contract between the parties. State Farm has no reasonable basis in its refusal to recognize and pay Plaintiffs the agreed replacement cost as per the Policy for damages caused by the wind and hail damage to the Insured Property.

57. As a consequence of State Farm's breach of the duty of good faith and fair dealing, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering that naturally results from an insurance failure.

58. State Farm's conduct was intentional, willful, malicious, and/or in reckless disregard of the rights of others. State Farm's actions during the handling of the Claims demonstrate it acted intentionally, and with malice and, breached its duty to deal fairly and in good faith. State Farm's actions were consistent with an overall collective corporate goal of decreasing indemnity losses and thereby increasing profits through the systematic underpayment and denial of claims. The Scheme is sufficiently egregious in nature so as to warrant the imposition of punitive damages. State Farm's Scheme demonstrates an enterprise-wide "pattern" theory of bad-faith conduct, liability for which is cognizable under Oklahoma law. *See* 12 Okla. Stat. § 2406; *Vining v. Enter. Fin. Group*, 148 F.3d 1206, 1218 (10th Cir. 1998) (where plaintiff sought to prove insured's pattern and practice of bad faith conduct, evidence regarding other insureds was relevant to show defendant "acted in this case under Federal Rule of Evidence 406 (habit)"); *see also Metzger v. Am. Fid. Assur. Co.*, 2007 WL 4342082, at *1 (W.D. Okla. Dec. 7, 2007); *Markham v. National States Ins. Co.*, 122 Fed. Appx. 392 (10th Cir. 2004) (evidence of nation-wide rescission practice supported bad faith); *Barnes v. Okla. Farm Bur. Mut. Ins. Co.*, 2000 OK 55, 11

P.3d 162, 170 ("*insurer's unreasonable treatment of Barnes was not an isolated incident, but the same or similar tactic was used by insurer repeatedly with other insureds*"; awarding actual and punitive damages); *Copeland v. Tela Corp.*, 2003 OK CIV APP 98, ¶ 3, 79 P.3d 1128 (confirming no abuse of discretion in allowing evidence of habit evidence under 12 O.S. § 2406 to show pattern and practice conduct.); *Jones v. Farmers Ins. Co., Inc.*, 2012 WL 12863976 (W.D. Okla) (court holds that similar claims are relevant to Plaintiff's contract claim and the claim of bad faith in that they may show a pattern and practice).

59. State Farm enjoyed increased financial benefits and ill-gotten gains as a direct result of the wrongful conduct described above herein, which resulted in the injury to Plaintiffs.

**COUNT III: NEGLIGENT PROCUREMENT OF INSURANCE**
***Against Agent***

60. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

61. At all material times hereto, Agent acted as State Farm's agent and/or employee. State Farm is thereby vicariously liable for the Agent's conduct.

62. In procuring the Policy, Agent had a duty to

a. use reasonable care, skill, and diligence to procure full replacement cost coverage as the insured requested that meets the insured's stated needs;

b. use reasonable care, skill, and diligence in undertaking the calculation of replacement cost for the insured;

c. speak accurately and truthfully by informing Plaintiffs of all full replacement cost coverages, advising Plaintiffs of the benefits, risks, limitations and exclusions thereof, and perform a reasonable inspection of the Insured Property prior to procuring the full replacement cost coverage and thereafter upon renewal to ensure no changes to the Policy were necessary or required; and

d. Disclose all material facts with respect to the Scheme as outlined within this Petition.

63. Agent breached Agent's duty owed to Plaintiffs by:

a. Knowingly and purposefully procuring and renewing

   i. illusory full replacement cost coverage (in that all fortuitous losses are not covered under the Policy);

   ii. full replacement cost coverage deviating substantially and materially from that which Plaintiffs requested;

   iii. a Policy that did not accurately reflect the replacement cost of the Insured Property (*i.e.*, an amount that was 100% insurance to value as represented);

   iv. a Policy that, as written, did not provide full replacement cost coverage to fully restore the Insured Property back to its pre-loss condition;

b. Failing to

   i. follow and abide by State Farm's underwriting policies/guidelines;

ii. perform all necessary inspections of the Insured Property;

iii. confirm the accuracy of the pre-filled information provided by State Farm's replacement cost estimating tool;

iv. disclose pre-existing damage to the Insured Property;

v. verify whether its inherent representation to State Farm and Plaintiffs that the Insured Property (including the roof) was in good condition was accurate;

vi. procure and renew a policy that provided the requested full replacement cost coverage for all fortuitous losses; and

vii. disclose all material facts of the Scheme as outlined within this Petition.

64. Plaintiffs relied on Agent's representations to substantial detriment.

65. As a result of Defendants' conduct, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

66. Defendants' conduct was intentional, willful, malicious and in reckless disregard of the rights of others and is sufficiently egregious in nature so as to warrant the imposition of punitive damages. Defendants acted intentionally, and with malice and, breached duties owed to Plaintiffs. Defendants' actions were consistent with their overall collective corporate goal of increasing profits through the systematic underpayment and denial of claims.

## COUNT IV: CONSTRUCTIVE FRAUD AND NEGLIGENT MISREPRESENTATION
### *Against All Defendants*

67. All allegations in the preceding paragraphs of this Petition are fully incorporated as if each were fully set forth herein.

68. Defendants owed Plaintiffs a legal and/or equitable duty to disclose all material facts that may arise out of their relationship as insurer and insured. *Croslin v. Enerlex, Inc.*, 2013 OK 34, ¶17, 308 P.3d 1041.

69. The concealment of a material fact which substantially affects another person constitutes fraud. *Patel v. OMH Medical Center, Inc.*, 1999 OK 33, ¶34; *Sutton v. David Stanley Chevrolet*, 2020 OK 87, ¶10, 475 P.3d 847. Fraudulent representations may consist of half-truths calculated to deceive, and a representation literally true is actionable if used to create an impression substantially false. *Sutton*, 475 P.3d at 15. Where the peculiar circumstances give rise to a duty on the part of one of the parties to a contract **to disclose material facts and the party remains silent to his or her benefit and to the other party's detriment**, the failure to speak constitutes fraud. *Id.* (citing *Croslin*, ¶17) (emphasis added).

70. "[A] variety of facts and circumstances [] will give rise to a duty to disclose material facts." The *Sutton* Court reiterated that it has "consistently found the existence of the requisite circumstances, *i.e.*, that which is necessary to create a duty to disclose, when the offending party created a false impression concerning material facts that was relied upon by the other party to his detriment and to the benefit of the offending party." *Id.* at 15.

71. A negligent or innocent misrepresentation or concealment for constructive fraud occurs when one who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Negligent misrepresentation can also be based on a material omission. *See, e.g.*, *Lopez v. Rollins*, 2013 OK CIV APP 43, ¶12, 303 P.3d 911, 916; *Sutton*, 2020 OK 87, at ¶11; *Stroud v. Arthur Andersen & Co.*, 2001 OK 76, ¶34, 37 P.3d 783, 794; *Ragland v. Shattuck Nat'l Bank*, 36 F.3d 983, 992 (10th Cir. 1994) (applying Oklahoma law).

72. Defendants owed specific duties to Plaintiffs. These duties are encompassed in State Farm's duty of good faith and fair dealing owed to its insureds, as well as specific duties Agent owed Plaintiffs—a duty to exercise reasonable diligence and skill in obtaining and accurately notifying of the nature and character of the insurance procured, the duty in undertaking the calculation of replacement cost for the insured to use reasonable care, skill, and diligence to do so, the duty to speak accurately and truthfully, and the duty to disclose all material facts relating to the Scheme as outlined within this Petition.

73. Defendants breached this duty by misrepresenting, concealing, or omitting pertinent material facts from Plaintiffs, including (but not limited to) the following:

a. Defendants misrepresented the Insured Property met all underwriting requirements, that all property inspections had occurred, and that the replacement cost values Agent calculated were accurate and commensurate with reconstruction

costs such that the full replacement cost coverage would fully restore, replace and/or repair the Insured Property (including its roof) in the event of a loss by a covered event.

b. Defendants misrepresented that the Insured Property (and, specifically, its roof) was eligible for the comprehensive full replacement cost coverage (rather than ACV).

c. Defendants failed to disclose that pre-existing issues with the Insured Property would either prevent issuance of the full replacement cost coverage or limit replacement cost coverage for any damage during the Policy period.

d. Agent misrepresented the procurement of the comprehensive full replacement cost coverage Plaintiffs requested.

e. Defendants misrepresented that the Policy covered all fortuitous losses and that weather-related damage (even cosmetic)—big or small—was fully covered under the Policy.

f. Defendants failed to disclose all material information to an insured about State Farm's bad faith claims handling tactics, its reliance on undisclosed definitions and standards outside of the Policy, internal and external complaints about State Farm's handling of wind and hailstorm claims, and other material information any insured would deem reasonable in making a purchasing decision.

g. Defendants failed to disclose to Plaintiffs any of the above misrepresentations and/or omissions, any facts underlying these misrepresentations, or any material facts regarding the Scheme, including the Wind/Hail Focus

Initiative, implemented with the goal of reducing indemnity payments to policyholders like the Plaintiffs on valid wind and hail claims or State Farm's use of biased third-party adjusters and/or engineers who further implement the Scheme outlined herein by consistently writing reports and estimates to deny full roof replacements on valid wind and hail claims.

74. Nevertheless, Defendants sold and renewed illusory full replacement cost coverage to Plaintiffs knowing such statements were untrue.

75. As a result of both State Farm and Agent's breach of duty, each gained an advantage by misleading Plaintiffs to substantial detriment and prejudice. These breaches of duty induced Plaintiffs to accept, purchase, and renew the State Farm replacement cost policy.

76. State Farm and Agent's misrepresentations constitute constructive fraud.

77. At all relevant times, Agent was State Farm's employee and/or agent.

78. As a result of the Defendants' constructive fraud, Plaintiffs sustained damages, including deprivation of monies rightfully belonging to Plaintiffs, and ordinary or garden variety harm of anger, stress, worry, physical and emotional suffering.

79. Defendants' conduct was intentional, willful, malicious, and in reckless disregard of the rights of others, and/or was grossly negligent, and is sufficiently egregious in nature so as to warrant the imposition of punitive damages.

## VI. PRAYER FOR RELIEF

**WHEREFORE**, this Court should enter judgment on behalf of Plaintiffs against all Defendants for:

(a) Monetary relief aggregating in excess of $250,000.00, excluding interest, statutory or punitive damages and penalties, and attorney fees and costs;

(b) Punitive damages under Oklahoma law;

(c) Disgorgement of the increased financial benefits derived by any and/or all of the Defendants as a direct result of the Defendants' wrongful conduct; and

(d) Prejudgment interests, costs and attorneys' fees.

Respectfully submitted,

*Reggie Whitten*

Reggie N. Whitten, OBA No. 9576
Michael Burrage, OBA No. 1350
Blake Sonne, OBA No. 20341
Hannah Whitten, OBA No. 35261
John S. Sanders, OBA No. 34990
Jake Denne, OBA No. 35097

**WHITTEN BURRAGE**
512 North Broadway Avenue, Suite 300
Oklahoma City, OK 73102
Office: 405.516.7800
Facsimile: 405.516.7859
rwhitten@whittenburragelaw.com
mburrage@whittenburragelaw.com
bsonne@whittenburragelaw.com
hwhitten@whittenburragelaw.com
jsanders@whittenburragelaw.com
jdenne@whittenburragelaw.com

***Attorneys for Plaintiffs***

***ATTORNEYS' LIEN CLAIMED***
***JURY TRIAL DEMANDED***